OPINION OF THE COURT
Memorandum.
The order of the Appellate Division should be affirmed.
The question on this appeal is whether the evidence was sufficient to support defendant’s conviction on arson and felony murder charges stemming from a December 4,1980 hotel fire in which 26 people lost their lives. The trial court set aside the jury’s verdict of guilt and the Appellate Division unanimously affirmed.
The well-settled standard of proof in circumstantial evidence cases is that the facts from which the inference of defendant’s guilt is drawn must be inconsistent with the defendant’s innocence and must exclude to a moral certainty every other reasonable hypothesis (People v Sanchez, 61 NY2d 1022,1024; People v Way, 59 NY2d 361, 365; People v Bearden, 290 NY 478, 480). Viewing the evidence in the light most favorable to the prosecution, and giving it the benefit of every reasonable inference to be drawn therefrom, this court must now determine whether the jury reasonably concluded that the prosecution met this standard.
The People at trial called more than 40 witnesses and introduced a multitude of exhibits. While the evidence was sufficient *743 to establish that the fire was intentionally set (see, People v Sims, 37 NY2d 906), the deficiency in the People’s case lies in proof of the arsonist’s identity. According to the prosecution, defendant’s identity as the arsonist was proved by evidence of three points, each separately considered below: defendant’s opportunity to set the fire and his access to the accelerant allegedly employed; his motive; and his consciousness of guilt as revealed in several statements he made following the fire.
OPPORTUNITY AND ACCESS
The People contend that the evidence established defendant’s access to the accelerant and his presence at the intersection of the Haight and Common Hallways, the origin of the fire, at the time the fire was set.
Though expert testimony failed to reveal directly the type of accelerant used, the prosecution asked the jury to infer that a mixture of sterno, or handy fuel, and gasoline caused the fire. In support of this theory, the People established that a bottle found in the kitchen service hallway near the Wilson Room three weeks after the fire, which had been left there before the fire, contained residue of such a mixture. Even if this inference were justified, there is no support for the added inference that defendant had exclusive access to such a mixture, or that he was in possession of this mixture at a point close in time to the fire. Defendant had access to sterno, used on his coffee cart, but as the prosecutor admits, sterno alone could not have caused the fire; nor is it contended that sterno was inaccessible to other employees of the hotel or the general public. As to gasoline, the prosecution established only that about two months before the fire, defendant had a siphon and an empty gasoline container in the back of his car. This remote connection does not support an inference that defendant had possession of the accelerant on the day of the fire.
The People urge that defendant’s presence at the CommonHaight intersection when the fire ignited was established by eyewitness testimony of defendant’s whereabouts just before the fire, by defendant’s admissions regarding his activity before and during the fire, and by testimony concerning observations made and noises heard when the fire began. Consideration of this argument must begin with the recognition that defendant’s employment provides an innocent explanation for his presence in the hotel at all times and places, except for any presence in the Common-Haight intersection at the moment the fire was set.
On the morning of the fire, various hotel employees saw defendant preparing for the coffee breaks. At about 10:00 a.m., *744 he was setting up for a 10:30 a.m. coffee break outside the Disbrow “A” Room, where Nestle Corporation executives were meeting. He then went back to the kitchen area and from there to the Jefferson Room, located in an adjoining building, where Alex Pastor was setting tables. Pastor testified that defendant left the Jefferson Room at about 10:10 a.m., some 15 minutes before Pastor heard the fire alarm. According to defendant’s statement to the police, he went back to the kitchen to arrange for a coffee break for executives meeting in the Wilson Room. When Joseph Romero, the banquet captain, appeared in the kitchen area, defendant said he needed some sodas for the coffee break. Romero testified that he let defendant into the liquor room, after which defendant obtained the beverages and left. Romero did not notice exactly where defendant went when he left. According to defendant’s statements, he went back to the kitchen to load the bottles on the cart in preparation for the Wilson Room coffee break, then brought the cart through the Jaimison Room, and then entered the Common Hallway where he saw the fire. Romero testified that he heard someone yell “fire” four to six minutes after defendant left him. During an interrogation session with defendant, an officer timed how long it would take defendant, with a cart, to walk through the Jaimison Room. The trip lasted 18 seconds.
This evidence was not sufficient to pinpoint defendant’s entry into the Common Hallway before the fire began. As the Appellate Division demonstrated, the time the fire started was narrowed, but not fixed. Further, the evidence does not disclose how much time elapsed between defendant’s leaving Romero and his entry into the Common Hallway because there is no indication of how long defendant spent loading bottles in the kitchen. This deficiency alone undermines the significance of Romero’s testimony as to the four to six minute interval between defendant’s leaving and his hearing a person yell “fire.” The significance of that testimony is further reduced by the absence of evidence as to the length of time between the start of the fire and the scream heard by Romero.
The People also sought to establish defendant’s identity by producing three witnesses who saw or heard events surrounding inception of the fire. Raj Sabanayagan, an Arrow Electronics executive, testified that he went up to the Common Hallway from a lower floor to deliver a phone message. When he reached the top of the stairs, he saw a small bundle of fire and had the impression that he saw a figure stoking the fire. He could not identify this figure and could not even say it was a human being.
*745 Betty Jane Scheihing, another Arrow executive, saw a ball of fire when she exited the Nicols “B” Room after smelling smoke. She heard someone say, “come on, get out, come on.” Finally, Thomas Goodrum, a General Foods executive attending a conference in the Harrison Room, heard a vibration-type noise which sounded like a cart being pushed. Fifteen seconds to one minute later, he heard a female voice say, “Oh, my God.”
These witnesses do not point to defendant as the figure seen or the person heard. Neither Sabanayagan nor Scheihing could identify defendant. Nor does Goodrum’s testimony provide the necessary connection. Even assuming the noise he heard was in fact a cart being pushed, defendant’s cart was not the only one on the floor and an inference that defendant was the source of the noise was not justified.
MOTIVE
The prosecution established that three weeks before the fire, defendant informed his immediate supervisor, Silverio Ferreira, that he was an illegal alien. Ferreira indicated that defendant would probably be fired but assured defendant that he would check with his own supervisors. The day before the fire, Ferreira notified defendant that he would be fired in January. Additionally, at 8:00 a.m. on the morning of the fire, Ferreira reprimanded defendant because one of his coffee urns was dirty. This evidence, it is argued, established defendant’s desire for revenge on Stouffer’s or, alternatively, his confused belief that if he appeared as a hero in rescuing people from a fire, his job might be saved. Though this evidence of a possible motive cannot be ignored in examining the evidence in the light most favorable to the prosecution, it does not establish any element of the crime, and cannot take the place of proof of the accused’s actual commission of the crime.
CONSCIOUSNESS OF GUILT
According to defendant’s initial accounts of his movements during the fire, when he entered the Common Hallway and saw the fire, he immediately provided assistance to the occupants of the Harrison Room, either by breaking the window for them or by instructing them to do so and to jump to safety. Defendant told investigators that he escaped through the Haight Hallway. However, when he related a similar story to Ferreira nine days after the fire, Ferreira responded that it was impossible to escape through the Haight Hallway because it was too hot. Defendant admitted that his story was untrue and said he in fact escaped by running back through the Jaimison Room and out a
*746 rear exit. Asked by Ferreira why he had fabricated the story, defendant indicated that he wanted to be a hero. Defendant provided a similar explanation to police in several interviews. He also told police that at about 10:00 a.m., he accidentally dropped a lit can of handy fuel on the carpet and extinguished the flames with his feet. According to the prosecution, this statement was demonstrably false because witnesses who passed the area at or after 10:00 a.m. noticed nothing unusual. During the series of interrogations, police accused defendant of setting the fire, but defendant denied the accusation.
Evidence said to indicate consciousness of guilt is generally considered weak proof of the commission of a crime. (See, People v Moses, 63 NY2d 299,308; People v Benzinger, 36 NY2d 29,33.) Defendant’s false statements regarding efforts to assist others are not inconsistent with his innocence. An innocent person in defendant’s position may have uttered such statements not because of knowledge of his own guilt but because of a misguided desire to gain praise and possibly save his job. Defendant’s statements regarding the accidental fire do not establish consciousness of guilt because, as a threshold matter, the People did not prove them to be false. There is no indication that such an accident would have been so long in duration or its after-effects so apparent that passersby would necessarily have noticed them.
We therefore conclude that the verdict was properly set aside.
Chief Judge Wachtler and Judges Jasen, Meyer, Simons, Kaye and Alexander concur; Judge Titone taking no part.
Order affirmed in a memorandum.